### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| RAFAELA RUIZ, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:06-CV-130-JVB-PRC |
| | ) | |
| THE TRUSTEES OF PURDUE UNIVERSITY, | ) | |
|     Defendant. | ) | |

### FINDINGS, REPORT AND RECOMMENDATION OF
### UNITED STATES MAGISTRATE JUDGE PURSUANT TO
### 28 U.S.C. § 636(b)(1)(B) & (C)

This matter is before the Court on a Defendant's Motion for Summary Judgment [DE 15], filed by Defendant the Trustees of Purdue University ("Purdue") on August 1, 2007.  On February 12, 2008, District Court Judge Joseph S. Van Bokkelen entered an Order [DE 38] referring this matter to the undersigned Magistrate Judge for a report and recommendation on the Motion for Summary Judgment pursuant to 28 U.S.C. § 636(b)(1)(B).  This Report constitutes the undersigned Magistrate Judge's combined proposed findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  For the following reasons, the Court recommends that the District Court grant the Motion for Summary Judgment.

### PROCEDURAL BACKGROUND

On September 28, 2006, Plaintiff Rafaela Ruiz filed a thirteen count Complaint alleging that Purdue discriminated and retaliated against her, thereby violating her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"); and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.  Ruiz also

filed an Indiana Wage Payment Claim, pursuant to Indiana Code § 22-2-5 *et seq*., alleging that Purdue violated her rights by failing to pay her wages when due.  Within her Complaint, Ruiz requested lost wages and benefits, compensatory damages, treble damages under her Indiana Wage Payment Claim, pre- and post-judgment interest, attorney's fees and costs, and other unspecified legal and/or equitable damages.

On November 21, 2006, Purdue filed its Answer.  On August 1, 2007, Purdue filed a Defendant's Motion for Summary Judgment, as well as a Defendant's Memorandum in Support of Motion for Summary Judgment and an Appendix of Exhibits to Defendant's Statement of Material Facts and Brief in Support of Motion for Summary Judgment, seeking judgment as to each of Ruiz's thirteen claims.

On September 11, 2006, Ruiz filed a Response in Opposition to Defendant's Motion for Summary Judgment.  In the Introduction section of her Response, Ruiz abandoned twelve of her thirteen claims, stating that she has "decided not to pursue Counts one (1) through four (4) and Counts six (6) through thirteen (13) of her Complaint."  Pl.'s Resp. Br. Summ. J. at 1.  The sole count remaining following Ruiz's Response is Count Five, which alleges that Purdue intentionally, willfully, and/or recklessly violated Ruiz's Title VII rights by subjecting her to different terms and conditions of employment than those enjoyed by similarly situation, non-pregnant and/or male employees.

On September 14, 2007, with leave of the Court, Purdue filed a Statement of Material Facts in Support of its Motion for Summary Judgment.  On October 1, 2007, Purdue filed its Reply Memorandum in Support of Motion for Summary Judgment.

## FACTUAL BACKGROUND

The parties are largely in agreement as to the following facts, taken from the pleadings, the parties' briefing on Defendant's Motion for Summary Judgment, and the documents submitted in support thereof. Any facts that are in dispute are identified and construed in a light most favorable to Ruiz, the nonmoving party.

The Trustees of Purdue University is a corporate body created by the Indiana legislature through Indiana Code § 20-12-37-1 *et seq*. The Trustees of Purdue University operate Purdue University. The Trustees have the power to "prescribe the curricula and courses of study offered [at Purdue University] and define the standards of proficiency and satisfaction within the curricula and courses established by [Purdue University]." Ind. Code § 21-41-2-1.

Within Purdue's graduate school program, a student's "enrollment in the Ph.D. program and appointment as a graduate research assistant are contingent upon the student's satisfactory academic work and/or work performance in accordance with Purdue's established policies and procedures." Defs.' Br. Summ. J., Ex. A (Declaration of Thomas W. Atkinson, Ph.D.), ¶ 2. Further, "Graduate assistantships throughout the Graduate School are incidental to and dependent upon successful academic performance as a graduate student." *Id*. at ¶ 3.

A graduate student enrolled in Purdue's Department of Biological Sciences is graded on her course work and on her research work. Some courses issue grades of "A," "B," and "C" to assess student performance. Other course issues grades of "S" (Satisfactory), "U" (Unsatisfactory), and "I" (Incomplete) to assess whether a student has met that particular course's objectives.

In the Department of Biological Sciences, an "I" signifies a "temporary record of work which was interrupted by unavoidable absence or other causes beyond the student's control." Defs.' Br.

3

Summ. J., Ex. C (Declaration of Morris Levy, Ph.D.), ¶ 11 (citing Graduate Student Procedures at p. 26). "The grade is given if the work of the student was passing at the time it was interrupted, and means that the student need not repeat the course in order to obtain credit[.]" *Id*. "If the student completes the work and achieves a permanent grade 'no later than the 12th week of the second subsequent semester of enrollment,' then the 'I' grade is replaced with the permanent grade." *Id*. (quoting Graduate Student Procedures at p. 26). "If a student fails to complete the work within that time frame, then the grade reverts to a failing grade." *Id*. (citing Graduate Student Procedures at p. 26). "If a student needs additional time beyond two semester to complete the work, she may ask her department head for an extension of time." *Id*.

If a student disagrees with the assignment of a grade, Purdue has established appeal procedures. Up to two appeal committees can review the grade appeal: the College Grade Appeal Committee and the University Grade Appeal Committee. An appealing student is entitled to submit a written statement and may be given the opportunity to make a presentation to the Appeals Committee(s). The Committee(s) may, by majority vote, recommend changing the original grade.

In January 1998, Ruiz, a native of Equador, came to the United States to study at Purdue University in Lafayette, Indiana. In 2002, Ruiz's studies at Purdue yielded a master's degree in horticulture. In the fall of 2002, Ruiz enrolled in the Purdue biology department as a Ph.D. graduate student. After completing her initial rotation in the spring of 2003, a process whereby each graduate student spends a portion of her first semester or academic year in the laboratory of each faculty member in her Ph.D. program, Ruiz chose to work in the laboratory of Ignacio Camarillo, Ph.D. Dr. Camarillo became Ruiz's major professor in the biology department.

Ruiz started her lab work in the fall of 2003 and earned a "satisfactory" grade for her efforts that semester. Ruiz also earned a "satisfactory" grade from Dr. Camarillo for her lab work in the spring 2004 semester. Ruiz went on to pass her first year qualifying examination in the spring 2004 semester.

In June or July of 2004, Ruiz moved from Lafayette to the Indianapolis area because according to Ruiz, she wanted to have a baby and she wanted to be closer to treatment for her type 2 diabetes. Purdue contends that Ruiz moved after her husband took a job in Indianapolis. Purdue states that in the spring and summer of 2004, Ruiz did not possess a driver's license and did not drive.

Ruiz contends that as of May 2004, Dr. Camarillo knew of her status as a type 2 diabetic. Purdue, seemingly in agreement, represents that in the summer of 2004, Ruiz informed Dr. Camarillo that she wanted to move to Indianapolis to obtain better treatment for her medical conditions of "pre-diabetes" and "metabolic syndrome." Pl.'s Resp. Br. Summ. J., Ex. A., Ruiz Dep. at 116-17. At deposition, Dr. Camarillo testified that he discussed Ruiz's situation with Nuria Morall, Ph.D., a member of the Indiana University Purdue University Indianapolis ("IUPUI") faculty. Dr. Morall agreed to advise Ruiz on a research area different from the area that Ruiz presented to the Purdue advisory committee.

In the fall 2004 semester, Ruiz and Dr. Camarillo decided on a topic for Ruiz's dissertation. The topic dealt with research on leptin expression in mammary glands.

During the Fall 2004 semester, Ruiz traveled to Purdue's Lafayette campus and performed work in Dr. Camarillo's lab approximately one or two times per week. Ruiz testified at deposition that during the first week of February 2005, she informed Dr. Camarillo that she had been diagnosed

with a high-risk pregnancy and that she had been advised that she should not travel to Lafayette. Ruiz testified that she also advised Dr. Camarillo that she should not be exposed to any toxic chemical during her pregnancy. In the Spring 2005 semester, due to complications in her pregnancy, Ruiz did not travel to Lafayette as often, and worked in Dr. Camarillo's lab a total of four times. Dr. Camarillo agreed that Ruiz should not travel due to the complications in her pregnancy. Ruiz was able to continue working in Dr. Morall's lab at IUPUI during the Spring 2005 semester.

Ruiz recalled that a Purdue undergraduate student was supposed to deliver samples to her in Indianapolis so she could complete her assigned work for the spring of 2005. The undergraduate student, Guy Watkins, also worked in Dr. Camarillo's laboratory. Ruiz stated that she never received the samples and as a result was unable to complete her work that semester.

Dr. Camarillo issued Ruiz an incomplete grade for the Spring 2005 semester due to her inability to complete her assigned work. Dr. Camarillo attributed the grade to "unavoidable absence or other causes beyond the student's control." Ruiz Dep. at 130. Dr. Camarillo informed Ruiz that she had until the end of the summer to remove the incomplete grade before it changed to an unsatisfactory grade. In order to remove the incomplete, Ruiz testified that Dr. Camarillo said she had to travel to Lafayette every day until she had developed a working technique. Ruiz recalled that she reminded Dr. Camarillo that she could not physically travel to Lafayette every day.

Ruiz complained about the incomplete grade to Dr. Morris Levy, Dr. Camarillo's faculty advisor, requesting that her grade be modified and that Dr. Camarillo be removed from her advisory committee and as her major professor. Dr. Levy indicated that he considered the leptin expression work to be an issue secondary to her work for Dr. Morral, but that she must resolve the issue "favorably" within one year. *Id*. at 137-38. Dr. Levy further indicated that Ruiz had until May 2006

6

to complete her work.  In May 2005, Ruiz understood that she had until May 2006 to complete the leptin expression work and remove the incomplete grade.

In the summer of 2005, Ruiz's physician placed her on bed rest for several weeks during which time she took leave from Purdue, lasting from July 25, 2005 until October 17, 2005.  Ruiz updated Dr. Camarillo as to her condition in August 2005, and recalled that she expressed confidence that she would still be able to complete the leptin expression work "by the end of 2005." *Id*. at 146.  Because she was again unable to complete her assigned work in the summer of 2005, Dr. Camarillo issued Ruiz an incomplete grade for that semester.  Ruiz protested the incomplete grade to Dr. Levy, who intervened to remove the incomplete and changed the grade to "satisfactory."

Ruiz gave birth to her son in August 2005, and returned to work in Dr. Morral's lab approximately two months later.  IUPUI approved Ruiz for leave time for the time period that she was away from the lab during and immediately following her pregnancy.  Ruiz received a satisfactory grade for the Fall 2005 semester.

The Purdue University Department of Biological Sciences sent a letter dated December 8, 2005, to Ruiz signed by Melanie Jackson, Payroll Clerk.  The first sentence of the letter provides, "This is to verify Ms. Rafaela Ruiz's employment."  Pl.'s Resp. Br. Summ. J., Ex. B.  Regarding Ruiz's employment, the letter further states, "She will be employed as a half-time Graduate Teaching Assistant for the 2006 spring semester in the Department of Biological Sciences."  *Id*.  The letter continues, "Ms. Ruiz will continue to be employed as long as he [sic] is enrolled and remains in good standing."  *Id*.  The letter also sets forth Ruiz's annual salary.

Ruiz testified that she received a copy of the Graduate Student Employment Manual ("Employment Manual").   Concerning the status of graduate school student assistants, the Employment Manual states that Purdue:

> [M]akes assistantships and fellowships available as forms of financial aid in support of graduate study.  Employment is incidental to graduate study.  Graduate students who are employed by the University provide services (teaching, research, administrative/professional) that further the missions of the University while providing students with valuable professional experience and financial remuneration in the form of tuition remission and a salary.

Atkinson Decl. Summ. J., ¶ 4.  The Employment Manual further provides, "Continuation of graduate employment is conditional upon performance of the work assigned and/or satisfactory academic progress."  *Id*. at ¶ 6 (citing Employment Manual at p. 14).

In February 2006, Dr. Camarillo resigned from Ruiz's advisory committee and Purdue subsequently assigned her a new major professor.  Dr. Levy also left Ruiz's advisory committee upon Ruiz's request between October and December of 2005.

Ruiz did not work on the leptin expression project during the fall of 2005 or the spring of 2006.  Purdue changed the incomplete that Ruiz earned in the Spring 2005 semester to an "unsatisfactory" grade when Ruiz failed to complete her assigned work within the prescribed time. Ruiz appealed the grade to the College Grade Appeals Committee.  The Appeals Committee found in Ruiz's favor and changed the grade from unsatisfactory to satisfactory.  At some point, Dr. Camarillo appealed the modification to the Purdue University Grade Appeal Committee.  According to the record, that appeal remains unresolved.

**STANDARD**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir.

1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists.  *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party.  *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wis. Dept. of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)).   However, intent and credibility are critical issues, frequently found in employment cases, that are genuinely contestable and not appropriate for a court to decide on summary judgment.   *Id*.   Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases.  *Wallace*, 103 F.3d at 1396.

## ANALYSIS

Following Ruiz's brief in opposition to Defendant's Motion for Summary Judgment, in which she abandoned twelve of her thirteen claims, only Count Five and its allegation of pregnancy discrimination remains.  As to Count Five, Purdue argues that (1) Ruiz is not an "employee" for purposes of Title VII and the PDA, and (2) in the alternative, Ruiz received the grade that she earned for legitimate reasons not related to her pregnancy and that there is no evidence that the reasons proferred for her grade were pretext for pregnancy discrimination.

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a).  In 1978, Congress amended Title VII to provide protection to pregnant women.  In its protection against discrimination due to sex, Title VII defines "because of sex" or "on the basis of sex" to include "because or on the basis of pregnancy, childbirth, or related

medical conditions; and women affected by pregnancy, childbirth, or related medical conditions
shall be treated the same for all employment-related purposes . . . as other persons not so affected
but similar in their ability or inability to work[.]" 42 U.S.C. § 2000e(k).  "An unlawful employment
practice occurs whenever pregnancy is a motivating factor for an adverse employment decision."
*Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1010 (7th Cir.
1997) (citing 42 U.S.C. § 2000e-2(m)).

### A.  "Employee"

Purdue first argues that Ruiz is not an "employee," as defined by Title VII.  Qualifying as
an employee is a necessary showing for a plaintiff who desires the protections offered by Title VII.
*See O'Neill v. Indiana Com'n of Public Records*, 149 F. Supp. 2d 582, 586 (S.D. Ind. 2001) (citing
42 U.S.C. § 2000e-5) ("Any 'person aggrieved' may bring suit under Title VII so long as they allege
that the employer discriminated or retaliated against an 'employee.'").  Title VII circularly defines
"employee" as "an individual employed by an employer[.]" 42 U.S.C. § 2000e(f).  This inadequate
definition has caused much frustration within the federal court system.  *See Nationwide Mut. Ins.
Co. v. Darden*, 503 U.S. 318, 323 (1992) (observing that a nearly identical definition of employee
contained within another federal statute "is completely circular and explains nothing."); *Smith v.
Castaways Family Diner*, 453 F.3d 971, 975-76 (7th Cir. 2006).  However, the case law
interpretation subsequent to the passage of Title VII gives meaning to this vague description.  In
addition, the Equal Employment Opportunity Commission ("EEOC") set forth a list of sixteen
factors derived from the Supreme Court's decision in *Darden* to identify those individuals who
qualify as employees for purposes of Title VII and other federal anti-discrimination statutes.  *See*
503 U.S. 318.  The collective focus of the EEOC factors is "whether the employer controls the

means and manner of the worker's work performance."   EEOC Compliance Manual (CCH) ¶
7110(A)(1), at 5716 (2003); *see also Smith*, 453 F.3d at 976.

The parties contend that the factual situation presented here, whether a graduate student who
works for a university in exchange for a stipend and a tuition and fee remission is an employee,
presents a question of first impression within the Seventh Circuit.   Other circuits have considered
this precise issue, and in so doing, have arrived at differing results.   The divide is a result of courts
applying two different viewpoints.

The "incidental" view can be summarized as finding that any person who renders services
that are completely incidental to an educational program is not an employee.   *See Pollack v. Rice
Univ.*, No. H-79-1539, 1982 WL 296 (S.D. Tex. Mar. 29, 1982).   For example, in *Pollack* the district
court considered whether a plaintiff who had been admitted "to a scholastic program which entails
the performance of services for remuneration, where the services are completely incidental to the
scholastic program," qualified as an employee for Title VII purposes.   1982 WL 296, at *1.   The
plaintiff alleged that he had been discriminatorily rejected from consideration for two potential jobs.
The court found that the jobs the plaintiff sought and was turned down for would have been
attendant to the plaintiff's capacity as a graduate student and that "the status of such a plaintiff is
that of 'student' not 'employee[.]'"   *Id.*   The Court concluded that "Title VII, thus, affords no cause
of action."   *Id.*

Under the second view, known as the "economic realities" view, courts analyze the
circumstances of the alleged employee-employer relationship to determine whether the plaintiff is
an employee.   In *Cuddeback v. Florida Board of Education*, the court considered whether a graduate
student who worked in a cancer research laboratory of a university professor qualified as an

13

employee.  *See* 381 F.3d 1230 (11th Cir. 2004).  The court began its analysis by stating that the

United States Court of Appeals for the Eleventh Circuit generally applies the "economic realities"

view in determining whether a particular individual is an employee for purposes of Title VII.  *Id.*

at 1234.  The court proceeded to consider common law factors such as "whether the defendant

directed the plaintiff's work and provided or paid for the materials used in the plaintiff's work."  *Id.*

The court found the fact that much of the plaintiff's work in the university lab was done for

academic purposes weighed in favor of finding her a student.  However, the plaintiff received a

stipend and benefits for her work; received sick and annual leave; her employment was governed

by a comprehensive collective bargaining agreement; she used university equipment and training

in her work; and the decision to renew her appointment was based on employment reasons.  Each

of these factors militated in favor of finding the plaintiff an employee.  *See id.* at 1234-35.  The court

concluded that economic realities led to the rational conclusion that the plaintiff was an employee

for Title VII purposes.  *See id.* at 1235.

Other courts have employed reasoning similar to that in *Cuddeback* and focused on the

nature of the plaintiff's relationship with the education institution, and whether attendant economic

factors evidence a level of control common to an employee-employer relationship.  *Compare Ivan*

*v. Kent State Univ.*, 863 F. Supp. 581, 585-86 (N.D. Ohio 1994) (applying the economic realities

view, the court found that a graduate student assistant was an employee, relying on the fact that her

service to the university was governed by three contracts, that she earned a monthly graduate

assistantship stipend, and that the university withheld from her pay state retirement benefit

contributions and agreed to pay her compensation in compliance with state and federal law); *with*

*Jacob-Mua v. Veneman*, 289 F.3d 517, 520-21 (8th Cir. 2002) (the court, although it did not

expressly refer to the economic realities view, considered all of the relevant economic factors in finding that the plaintiff, a volunteer researcher, was not considered an employee for Title VII purposes because she was not paid, did not receive annual and sick leave benefits or coverage under any retirement program, and she was not entitled to merit promotion, holiday pay, insurance benefits, or competitive status).

The United States Court of Appeals for the Seventh Circuit has employed the economic realities view in several situations.  In *EEOC v. Dowd & Dowd, Ltd.*, the court applied the economic realities view to a Title VII analysis.  *See* 736 F.2d 1177, 1178 (7th Cir. 1984), *abrogated by Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449-51 (2003).[1]  Holding that shareholders in a professional corporation engaged in the practice of law are not employees for Title VII purposes, the *Dowd* court applied the economic realities view and reasoned that the shareholders were akin to managers and were able to exert control over the corporation.  *See* 736 F.3d at 1177-79. Further, in *Schmidt v. Ottawa Medical Center, P.C.*, the court applied the economic realities view to determine whether the plaintiff, a shareholder-director of a closely held professional corporation, was an employee for purposes of the Age Discrimination in Employment Act ("ADEA"), which has a definition of employee nearly identical to the definition provided by Title VII.  *See* 322 F.3d 461

---

[1]The *Dowd* decision was abrogated by the United States Supreme Court in *Clackamas*.  *See* 538 U.S. at 449-451.  Rather than applying the economic realities view, the *Clackamas* Court chose to use a similarly focused six-factor test to determine whether a shareholder-director of a professional corporation qualified as an employee for purposes of the Americans With Disabilities Act ("ADA"), which employs a definition of employee similar to that used in Title VII.  *See id.*  The Court reasoned that "the common-law element of control is the principal guidepost that should be followed in this case."  *See id.* at 448.  Ultimately, the Court posited that the "answer to whether a shareholder-director is an employee depends on 'all of the incidents of the relationship . . . with no one factor being decisive.'"  *Id.* at 451 (quoting *Darden*, 503 U.S. at 324 (citations and quotations omitted).  Interpreting *Clackamas*, the Seventh Circuit has set boundaries for application of the Supreme Court's six-factor test.  *See Smith v. Castaways Family Diner*.  *See* 453 F.3d 971 (7th Cir. 2006).  The court in *Smith* stated, "in the absence of evidence that an individual occupies a position in the enterprise that may give him or her the right to exercise control over the enterprise or its workers, the *Clackamas* test strikes us as inapposite."  *Id.* at 983.  Thus, the *Clackamas* test does not apply to lower level workers such as Ruiz.

(7th Cir. 2003).[2]  Several years earlier, in *Heinemeier v. Chemetco, Inc.*, the Seventh Circuit again referenced the economic realities view in analyzing whether a plaintiff should properly be classified as an employee.  *See* 246 F.3d 1078 (7th Cir. 2001).  The court wrote, "'When facing questions regarding the employee-employer relationship under Title VII . . . we 'look to the 'economic realities' of the relationship and the degree of control the employer exercises.'" *Id*. at 1082 (quoting *Knight v. United Farm Bureau Mut.*, 950 F.2d 377, 378-80 (7th Cir. 1991)).  On the facts before it, the court considered factors such as control exercised over the plaintiff, payroll records, and insurance coverage.  *See Hienemeier*, 246 F.3d at 1083.

Also, district courts within the Seventh Circuit have considered a number of situations analogous to the present dispute.  In a similar factual setting, a plaintiff student nurse in *Piotrowski v. Barat College* did not receive monetary compensation for his services, instead receiving practical experience toward his degree plus a tuition waiver.  *See* No. 93 C 6041, 1994 WL 594726 (N.D. Ill. Oct. 27, 1994).  The court found that the plaintiff was not an employee and instead worked in a capacity limited to students enrolled in the school's nursing program.  *See id*. at *1.  And in *Brewer v. University of Illinois*, the court substantively analyzed a Title VII claim filed by a graduate student research assistant without specifically analyzing whether or not he was an employee under the Act's definition.  *See* 407 F. Supp. 2d 946, 963-70 (C.D. Ill. 2005); *see also Stilley v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 968 F. Supp. 252, 262 (W.D. Pa. 1996) (without specifically analyzing whether the plaintiff qualified under the definition of "employee" provided in 42 U.S.C.

---

[2]The *Schmidt* court discusses alternate lines of precedent in considering factors under the economic realities approach.  The court ultimately found that whether it looked to factors contained in the statute's purpose or the factors contained in the general common law of agency, the result was the same as to the plaintiff in question.  322 F.3d at 465.

§2000e(f), the court substantively analyzed a graduate student researcher's Title VII claim).  Thus, the court effectively analyzed the merits of the plaintiff's case as if he were an employee.

The previous analysis makes clear that no single factor is determinative in analyzing whether a plaintiff qualifies as an employee.  There can be no one size fits all standard applied to the workplace environment where workers are compensated through any of an infinite number of variable compensation packages and where numerous entities may be involved in compensating and controlling a single worker.  Lest courts seeking to determine whether a plaintiff is an employee be left at sea, the employment legislation and regulations and related case law interpretation analyzed above have set general guideposts that can be referred to in a number of workplace contexts.  Of these guideposts, the central tenant for consideration is the level of control that the employer is able to exert over the worker.  Control in the workplace is most readily exercised through economic factors.  Thus, the Court's consideration of whether Ruiz is an employee of Purdue continues in the line of Seventh Circuit decisions, and will concentrate on the level of control that Purdue is able to exert over Ruiz and the economic factors attendant to their relationship.

Arguing that Ruiz is not an employee as defined by Title VII, Purdue constructs a legal and factual argument around the central premise that Ruiz is first and foremost a student.  In support, Purdue offers an affidavit of the Associate Dean of the Graduate School, Thomas W. Atkinson, Ph.D., who stated that "[g]raduate assistantships throughout the Graduate School are incidental to and dependent upon successful academic performance as a graduate student." Atkinson Decl. Sumn. J., ¶ 3.  Dr. Atkinson further stated that assistantships are a form of financial aid to support graduate study.  *See id*. (citing Employment Manual at 4).  In addition, Purdue also suggests that Ruiz's primary status as a student is reinforced by the fact that there is no evidence in the record that Ruiz

17

received paid leave, or other employment benefits.  Purdue summarizes Ruiz's assistantship as a form of financial aid to support her graduate study.  The Court finds Purdue's argument relevant but off target in this employment analysis because it focuses on Ruiz's primary role at Purdue– student or worker– rather than economic factors and control.

Ruiz, in response, focuses on a letter that she received from Purdue.  The letter, dated December 8, 2005, opens, "This is to verify Ms. Rafaela Ruiz's employment."  Pl.'s Resp. Br. Summ. J., Ex. B.  Further, the letter states, "She will be employed as a half-time Graduate Teaching Assistant for the 2006 spring semester in the Department of Biological Sciences.  Her salary is $18,048 per year.  This appointment includes tuition remission."  *Id*.  The letter concludes, "Ms. Ruiz will continue to be employed as long as he [sic] is enrolled and remains in good standing."  *Id*. Using a specific title when referring to a person cannot always be used to determine that person's particular role within an organization.  *See Clackamas*, 538 U.S. at 450 (citing *Darden*, 503 U.S. at 324).  Thus, Purdue's repeated references to Ruiz as an employee are not dispositive for Title VII purposes.

More relevant to this analysis are the several economic terms set forth in the letter, which are typical of employment and evidence a level of control.  The letter provides an annual salary rate for Ruiz.  Further, the letter sets forth a term of employment, the spring 2006 semester, and states that employment will continue as long as Ruiz remains a student in good standing.  This statement conditions Ruiz's employment on her studies and her role as a student.  However, it does show that Purdue controls the terms of the parties' relationship, and that Purdue can end the relationship, and Ruiz's work, if Ruiz does not meet Purdue's performance expectations.  The Court also notes that while a portion of Ruiz's compensation appears to have come in the form of tuition remission, it is

18

compensation nonetheless.  The fact that Ruiz was not compensated solely in the form of a monetary salary does not lessen Purdue's control over Ruiz.

The Court also finds relevant the Graduate Student Employment Manual that Purdue issued to Ruiz.  While issuing a document such as an employment manual does not "lead inexorably to the conclusion that either party is an employee," it is another factor for consideration.  *Clackamas*, 538 U.S. at 450 (citing *Darden*, 503 U.S. at 324).  Discussing graduate student workers, the Employment Manual provides, "These students are considered employees and are subject to the policies and procedures outlined in this manual."  Defs.' Br. Summ. J., Ex. A at 5.  However, a footnote contained at the end of the preceding sentence states, "While the University considers graduate students who provide services to be employees for most purposes, graduate student employees are not subject to certain federal laws governing the employer-employee relationship."  *Id.*  The footnote is relevant to Purdue's intent as to the role of its working graduate students, but any attempt it makes to disclaim Purdue from liability under Title VII is ineffective.  *See* 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, . . ." and further provides two exceptions that do not apply to Purdue.).  Because the test to determine "employee" status under Title VII focuses on control, and not employer intent, the footnote is not particularly useful in this analysis.

Analyzing the terms contained in the Employment Manual, which govern issues such as pay, termination, and retention, the Court finds that the Manual evidences additional control.  The Manual governed much of the relationship between Purdue and Ruiz.  Ruiz viewed the Employment Manual to be a governing document, having testified at deposition that she received a copy of the

Employment Manual when she started the graduate school program and understood that the policies and procedures contained in the Manual controlled the terms of her graduate student work. Therefore, the Court interprets the terms set forth in the Employment Manual to be another indication of Purdue's control.

Ultimately, the Court finds that under the circumstances presented in this case, Ruiz was a Purdue employee for Title VII purposes.  The Court recognizes that Ruiz's work is a result of her role as a graduate student.  The Court also concedes that in order of importance, Ruiz is likely a student first and a worker second.  Nevertheless, a worker is not confined to a single role.  And that is the case here.  In this case, Purdue compensated Ruiz for her work with an annual salary, provided a temporal term of employment, and controlled its relationship with Ruiz through an Employment Manual.  That several indicia typical of employment are absent here, such as sick leave and other benefits, does not reduce the control that Purdue had over Ruiz.  It is that control and its attendant economic factors that lead the Court to conclude that Ruiz has standing as an "employee" to bring a Title VII claim against Purdue.

**B.  Evidence of discrimination**

Purdue next argues that even if Ruiz is found to be an employee, she has not introduced sufficient evidence of discrimination to survive summary judgment.  For PDA purposes, a plaintiff can show an unlawful practice in two ways.  *See Maldanado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999).  First, under the direct method, the plaintiff can establish her claim by presenting "enough evidence to demonstrate that her discharge was a result of intentional discrimination." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998), *cert. denied*, 119 S. Ct. 167 (1998).  Direct proof can be shown through "the sort of evidence of discrimination

20

that in itself entitles [a plaintiff] to take [her] case to a jury without disproving [the defendant's] stated rationale for firing [her.]"  *Indurante v. Local 705, Int'l Bhd. of Teamsters, AFL-CIO*, 160 F.3d 364, 366 (7th Cir. 1998).

Evidence of intentional discrimination may either be direct or circumstantial.  *See Maldanado*, 186 F.3d at 763.  Direct evidence "can be interpreted as an acknowledgment of discriminatory intent by the defendant." *Troupe v. May Dept. Stores, Co.*, 20 F.3d 734, 736 (7th Cir. 1994).  Circumstantial evidence may be presented in the form of "ambiguous statements or suspicious timing." *Maldanado*, 186 F.3d at 763 (citing *Troupe*, 20 F.3d at 736).  A plaintiff may present a combination of direct and circumstantial evidence.  *See Maldanado*, 186 F.3d at 763.  "Once a plaintiff shows that an employment decision was motivated in part by her pregnancy, the defendant may avoid a finding of liability by proving that it would have made the same decision had the plaintiff not been pregnant." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir. 1996) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 245 (1989)).  For example, if a bona fide occupational qualification ("BFOQ") led to the employment action, the employer will not be liable under Title VII.  *See* 42 U.S.C. § 2000e-2(e)(1); *Maldanado*, 186 F.3d at 763.

Second, a plaintiff can prove her case under the *McDonnell Douglas* approach, which is referred to as the indirect method.  *See Maldanado*, 186 F.3d at 763.  Under the indirect method, a plaintiff must first establish a prima facie case of discrimination under Title VII and show the following: (1) that she is a member of a protected class; (2) that she lived up to her employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that a similarly situated employee, not in her protected class, received more favorable treatment from her employer. *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003).  If the plaintiff is able to put

21

forth a prima facie case of discrimination, the burden shifts to the employer to offer a legitimate non-discriminatory reason for the plaintiff's treatment. *See id.* (citing *Geier*, 99 F.3d at 241-42). If the employer successfully meets its burden, the burden shifts back to the plaintiff to show that the proffered explanation is pretextual. *See id.*

A PDA plaintiff can utilize either the direct or indirect method, or attempt to use both methods at once. *See Maldanado*, 186 F.3d at 763. "If a plaintiff merely emphasizes one method of proof, but the proper result is clear under the other method, we need not rely on procedural niceties and ignore the obvious." *Indurante*, 160 F.3d at 366-67. However, a plaintiff "must show a discriminatory motive either with some evidence that is incriminating in itself or by ruling out the other plausible motives for the adverse employment action." *Maldanado*, 186 F.3d at 763.

Here, Ruiz contends that "employing the direct method of proof and relying on circumstantial evidence[, she] has established a *prima facie* case of pregnancy discrimination." Pl.'s Resp. Br. Summ. J. at 11. Ruiz confuses the two methods of proof. While Ruiz can use the direct method by relying on circumstantial evidence, she would only need to establish a prima facie case of pregnancy discrimination if she elected to use the indirect method. Ruiz contends that she has established a prima facie case under the direct method, an unnecessary showing. Nevertheless, the Court moves beyond this procedural misunderstanding and will analyze the evidence that Ruiz has put forth under both methods of proof.

Purdue submits the following two arguments that Ruiz has failed to satisfy her burden of proof for summary judgment purposes: (1) there is no evidence that similarly situated graduate students were treated more favorably; and (2) Purdue had legitimate, nondiscriminatory reasons for assigning Ruiz an incomplete grade. The first argument refers only to the indirect method of proof,

whereby Ruiz must establish the four part prima facie case of discrimination.  The second argument applies to both methods of proof.

1.    *Similarly situated employees treated more favorably*

Making the required showing of a similarly situated employee normally requires a plaintiff to establish that she and her comparator "'dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct of the employer's treatment of them.'" *Humphries v. CBOCS West, Inc*., 474 F.3d 387, 404-05 (7th Cir. 2007), *cert. granted*, *CBOCS West, Inc. v. Humphries*, 128 S.Ct. 30 (Sep. 25, 2007) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)); *see also Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 644 (7th Cir. 2006).  However, the requirement "should not be applied mechanically or inflexibly."  *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006).

The analysis considers "all relevant factors, the number of which depends on the context of the case." *Radue*, 219 F.3d at 617.  "As to the relevant factors, an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Id*. at 618; *see also Goodwin v. Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 619 (7th Cir. 2006).

> [T]he inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation-recall that the plaintiff need not *prove* anything at this stage.

*Humphries*, 474 F.3d at 405.

In her briefing, Ruiz failed to analyze or even mention the issue of similarly situated employees treated more favorably.  Purdue did consider the issue.  Purdue draws the Court's attention to Ruiz's deposition, during which she identified two Purdue students and attempted to cast them as similarly situated employees.  The first potential comparative, Charles Rehrer, was a Ph.D. candidate who worked in Dr. Camarillo's laboratory and was, according to Ruiz, conducting nearly identical research to that being carried out by Ruiz.  Ruiz stated that the only difference between her research and Rehrer's was that in her testing, she started with normal animals, and Rehrer started with obese animals in his testing.  After that, Ruiz and Rehrer allegedly applied the same research techniques.

In her testimony, Ruiz attempts to describe how she and Rehrer were treated differently by Dr. Camarillo but her testimony is unclear.  The Court interprets Ruiz's testimony to allege that Dr. Camarillo unfairly allowed Rehrer to proceed with his research in the spring 2005 semester while Ruiz could not work due to her pregnancy.  Purdue gave its own interpretation of Ruiz's testimony regarding Rehrer.  Purdue believes that Ruiz attempted to argue that Dr. Camarillo should have instructed Rehrer to complete Ruiz's research work while Ruiz could not work.

In casting Rehrer as a potential comparator, Ruiz fails to show that Rehrer engaged in the same type of conduct that she did.  Ruiz did not complete her assigned work in the spring 2005 semester.  Ruiz alleges that Rehrer was treated more favorably either because he was allowed to continue his research while she was unable to work, or because he was not instructed by Dr. Camarillo to complete Ruiz's work.  The Court finds both arguments unpersuasive.  Because Dr. Camarillo agreed to allow Ruiz to work from Indianapolis, the Court sees no difference in the treatment given to Rehrer and that given to Ruiz.  There does however seem to be a significant

24

difference in the results produced by Ruiz and Rehrer.  Ruiz did not complete her work.  Ruiz does not allege and nowhere is it shown that Rehrer similarly failed to complete his work and was treated more favorably.

Further, the argument that Dr. Camarillo treated Ruiz less favorably because he did not assign her work to Rehrer finds no basis in the law or the facts of this case.  Dr. Camarillo was not required to assign Ruiz's work to anyone else.  Title VII provides for nondiscriminatory treatment, not for discriminatory treatment in favor of those who qualify for the statute's protection.  *See Maldanado*, 186 F.3d at 763 (citations omitted) ("[U]nder the PDA, employers are not required to give pregnant women special treatment; they must only treat them the same as all other employees.").  Thus, the Court concludes that Ruiz failed to establish Rehrer as a similarly situated employee and failed to show that he received more favorable treatment.

The second potential similarly situated employee that Ruiz mentioned in her deposition testimony is Guy Watkins.  According to Ruiz, in the spring of 2005, Guy Watkins was an undergraduate student.  Dr. Camarillo allegedly assigned Watkins to deliver research samples to Ruiz while she was in Indianapolis and restricted from travel during the Spring 2005 semester.  Ruiz testified that Watkins never delivered the samples.  Ruiz stated that she felt it was unfair that Watkins allegedly received a recommendation letter and passed his honor thesis.  Ruiz stated that she trained Watkins and believed that she would be credited for some of Watkins's work.  Ruiz recalled that she learned of Watkins's recommendation letter and thesis passage from a statement made by Dr. Camarillo.

The Court finds that as an undergraduate student, Watkins was enrolled in a different program than Ruiz.  Ruiz makes no showing that Watkins was subject to the same standards that she

25

was in her graduate Ph.D. program.  Contrary to any such assertion, Purdue provided the affidavit

of Thomas Atkinson, the Associate Dean of the Graduate School, who stated that graduate student

procedures do not apply to undergraduate students.  Thus, Watkins is not a proper comparator.

Because Ruiz cannot establish one of the four prima facie elements of a pregnancy discrimination

claim, her claim of discrimination fails under the indirect method.

2.      *Legitimate non-discriminatory reason for action*

Ruiz's failure to set forth a prima facie case of discrimination leaves her with only the direct

method to prove her claim.  Through the use of direct or circumstantial evidence, or both, Ruiz must

establish "that her discharge was a result of intentional discrimination."  *Kennedy*, 140 F.3d at 722.

Here, Ruiz was not discharged.  Rather, she alleges that Purdue discriminated against her by issuing

her a grade of incomplete for the Spring 2005 semester.[3]  Whether this constitutes an actionable

employment decision is unclear.[4]  Purdue decided to not challenge on those grounds, instead arguing

that it awarded Ruiz an incomplete grade for legitimate non-discriminatory reasons.  Specifically,

Purdue contends that Ruiz received the grade because she did not complete her work.

---

[3]The incomplete grade had the potential to affect Ruiz's employment according to the terms of her assistantship, yet Ruiz failed to assert such an argument or introduce any such evidence.

[4]In the opening section of its brief supporting summary judgment and again in its reply brief, Purdue noted that Ruiz's primary quarrel was over an academic grade and that she had "recast[] her claim against Purdue under Title VII[.]" Defs.' Br. Summ J. at 2.  While the Court previously held that her work for Purdue qualified Ruiz as an "employee," her discrimination claim is somewhat removed from her work.  Nevertheless, the issue of an "adverse employment action" was not raised beyond the comments contained in Purdue's brief and does not require further analysis.  However, for the sake of completeness, the court notes a similar situation considered by the United States District Court for the Northern District of New York in *Bucklen v. Rensselaer Polytechnic Inst.*, a case cited in Purdue's brief.  *See* 166 F. Supp. 2d 721 (N.D.N.Y. 2001).  The *Bucklen* court considered whether a graduate student who worked as a teacher's assistant had standing to assert a cause of action under Title VII.  The plaintiff argued that the school discriminated against him by assigning him a failing grade on three separate occasions in a preliminary examination for his doctoral degree.  The court decided even if the plaintiff had standing as an "employee" to file a Title VII action, that it "cannot extend the parameters of Title VII to encompass purely academic decisions, such as the testing and qualification of doctoral students, that have only a tangential effect on one's status as an employee."  *Id.* at 725.

Ruiz puts forth no direct evidence of discrimination by Purdue.  *See Indurante*, 160 F.3d at 366 (direct evidence is the sort of evidence that entitles a plaintiff to take her case to the jury without disproving the defendant's stated rationale for taking an adverse employment action against her). Rather, Ruiz contends that "Dr. Camarillo employed a policy that required Plaintiff to drive substantial distances and work with toxic chemicals in direct contradiction to her doctor's orders[.]" Pl.'s Resp. Br. Summ. J. at 11.  Ruiz also contends that "she lost her visa privileges and was prevented from working for approximately two (2) months."  *Id*. at 12.  However, it is unclear how Purdue caused Ruiz to lose her visa and the fact that she was unable to work for two months is not a result attributable to any action by Purdue.  Ruiz, who was without a driver's license at the relevant time, moved to Indianapolis and away from the Purdue campus.  Thus, the fact that she was unable to obtain work samples from the Purdue campus during her pregnancy cannot be blamed on Purdue. Purdue was not under any affirmative duty, nor is it argued that it was, to deliver the samples to Ruiz in Indianapolis.  Therefore, the Court will not analyze these problems further.

Ruiz is left to establish her theory of a discriminatory policy with circumstantial evidence. *See Maldanado*, 186 F.3d at 763 (citation omitted) (circumstantial evidence may come in the form of an ambiguous statement or suspicious timing).  Purdue admits that it gave Ruiz an incomplete grade because she was not able to travel to Lafayette, and was thus unable to complete her course work.  Purdue also acknowledges that the reason for Ruiz's inability to travel, her pregnancy and related complications, were unavoidable absences beyond her control.  Thus, Purdue admits the facts and argues that Ruiz's legal theory does not amount to actionable discrimination and that there was no discriminatory act taken against Ruiz.  With this, the Court agrees.  Purdue, through Dr. Levy, gave Ruiz a lengthy one-year extension of time to complete her course work and "favorably resolve"

her incomplete grade. Ruiz Dep. at 138. Ruiz testified in her deposition that she understood in May 2005, that she had until May 2006, to complete her work. Ruiz delivered her child in August 2005, but did not complete her incomplete work in the fall of 2005 or the spring of 2006. When May 2006 arrived, the work was still incomplete. Based on this evidence, the Court views this as a situation where Ruiz, largely due to health conditions, was unable to complete her work. It was an unfortunate setback in Ruiz's academic pursuit; however there is no evidence that Purdue acted discriminatorily against a pregnant Ruiz. Without some evidence of discrimination, Ruiz's claim cannot survive summary judgment.

Finally, in an attempt to shift the burden to defeat summary judgment to Purdue, Ruiz argues that Purdue failed to meet its burden of showing that it made the decisions at issue in this matter based on a BFOQ. BFOQ is a possible defense to a discrimination action, *see e.g. Monroe v. United Airlines*, 736 F.2d 394 (7th Cir. 1984), however Purdue did not raise it here. Rather, Purdue asserted a valid defense that the challenged action was made for legitimate, non-discriminatory reasons. Thus, Purdue's failure to discuss BFOQ has no bearing on the Court's decision.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment [DE 15].

This Report and Recommendation is submitted pursuant to 28 U.S.C. § 636(b)(1)(B). Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have ten (10) days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. *Willis v. Caterpillar, Inc.*, 199 F.3d 902, 904 (7th

Cir. 1999); *Hunger v. Leininger*, 15 F.3d 664, 668 (7th Cir. 1994); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-261 (7th Cir. 1989); *Lebovitz v. Miller*, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

SO ORDERED this 20th day of February, 2008.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

29